**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LINDA A. LEFEVER,**

                                        **Plaintiff,**

        **vs.**                                                **5:07-CV-622**
                                                            **(NAM/DEP)**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                            **OF COUNSEL:**

Olinsky & Shurtliff, LLP                    Jaya Shurtliff, Esq.
300 S. State Street, 5th Fl.
Syracuse, New York 13202
*Attorneys for Plaintiff*

Richard Hartunian                           Dennis J. Canning, Esq.
United States Attorney for                  Special Assistant U.S. Attorney
the Northern District of New York
P.O. Box 7198-
100 South Clinton Street
Syracuse, New York 13261-7198

Social Security Administration              Karen G. Fiszer, Esq.
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
*Attorneys for Defendant*

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Linda A. Lefever, brings the above-captioned action pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3) of the Social Security Act, seeking review of the Commissioner of Social

Security's decision to deny her application for disability benefits ("DIB") and supplemental security income ("SSI").

## II.    BACKGROUND

On December 30, 1998, plaintiff protectively filed an application for DIB and SSI. (T. 243-247).[1]  Plaintiff was 32 years old at the time of the application. (T. 57).  Plaintiff claimed that she became disabled on November 6, 1998 due to muscle spasms, low back pain and pain in her shoulders, left arm and left leg.  (T. 25).  On June 16, 1999, plaintiff's application was denied. (T. 44).  On August 24, 1999, on reconsideration, plaintiff's application was denied and plaintiff requested a hearing by an ALJ which was held on December 7, 1999. (T. 50, 262).  On April 19, 2000, ALJ Joseph Medicis Jr. issued a decision denying plaintiff's claim for benefits. (T. 271-284).  On May 18, 2000, plaintiff requested a review of the ALJ's decision by the Appeals Council.  (T. 285).  On January 11, 2001, while plaintiff's claim was pending with the Appeals Council, plaintiff filed a new application for DIB and SSI alleging back pain, leg pain and spasms. (T. 339).  On June 5, 2001, plaintiff's second application was denied and plaintiff requested a hearing. (T. 629).  On June 6, 2004, the Appeals Council issued a decision on plaintiff's 1998 application and remanded to the ALJ to re-evaluate plaintiff's mental impairment; re-evaluate plaintiff's residual functional capacity including the opinions of examining and treating sources; re-evaluate plaintiff's subjective complaints; and to obtain evidence from a vocational expert, if necessary. (T. 324).

Plaintiff's applications were consolidated and a hearing was held before ALJ Medicis on November 16, 2004. (T. 650).  On January 13, 2005, the ALJ issued a decision finding that

---

[1] "(T.)" refers to pages of the Administrative Transcript, Dkt. No. 8.

plaintiff was disabled since January 1, 2002, but not disabled from November 6, 1998 until December 31, 2001. (T. 38).  Plaintiff requested a review of the portion of the ALJ's decision relating to the period from November 6, 1998 until December 31, 2001. (T. 19).  The Appeals Council denied plaintiff's request for review on May 23, 2007 making the ALJ's decision the final determination of the Commissioner. (T. 8).  This action followed.

## III.   DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."   The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131.  Substantial evidence has been interpreted to mean "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

On January 13, 2005, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since her alleged onset date. (T. 26). At step two, the ALJ concluded that plaintiff suffered from cervical and lumbosacral strain/sprain and affective disorder which qualified as "severe impairments" within the meaning of the Social Security Regulations (the "Regulations"). (T. 37). At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 37). The ALJ found, from November 6, 1998 through December 31, 2001, that plaintiff had the residual functional capacity ("RFC") to, "lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, stand and walk six hours and sit six hours in an eight-hour work day and occasionally climb, balance, stoop, knee, crouch and crawl. Furthermore, she had the ability to understand, carry out and remember simple instructions, use judgment, respond appropriately to supervision, co-workers, and the usual work situations and deal with changes in a routine work setting". (T. 37). At step four, the ALJ concluded, from November 6, 1998 through December 31, 2001, that plaintiff did not have the residual functional capacity to perform any of her past relevant work. (T. 38). Relying on the medical-vocational guidelines ("the grids") set forth in the Social Security regulations, 20 C.F.R. Pt. 404, Subpt. P, App.2, the ALJ found, from November 6, 1998 through December 31, 2001, that plaintiff had the exertional capacity to perform the demands of the full range of light work. (T. 38). Therefore, the ALJ concluded, from November 6, 1998 through December 31, 2001, plaintiff was not under a disability as defined by

the Social Security Act.[2]  (T. 38).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ erred when he failed to follow the Appeals Council remand order with regard to plaintiff's mental impairment; (2) the ALJ failed to properly apply the treating physician rule; (3) the RFC determination by the ALJ is not supported by substantial evidence; and (4) plaintiff presents non-exertional impairments which require the use of a vocational rehabilitation expert rather than reliance upon the grids.  (Dkt. No. 13).

**A.    Plaintiff's Mental Impairments and Appeals Council Remand**

Plaintiff argues that the ALJ failed to follow the Appeals Council directive with respect to plaintiff's mental impairments.  (Dkt. No. 13, p. 21).  Plaintiff claims that the ALJ should have ordered a consultative psychological examination and/or requested a retrospective opinion from plaintiff's mental health providers.  The Commissioner contends that the ALJ reasonably concluded that plaintiff failed to prove that she had a disabling mental impairment.  (Dkt. No. 17, p. 7).

An impairment is severe if it significantly limits physical or mental abilities to do basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b),

---

[2] The ALJ also found:

Since January 1, 2002, [plaintiff] retained the [RFC] to meet the physical demands of light work.  However, she is seriously limited in her abilities to maintain attention and concentration to understand, carry out and remember simple instructions, respond appropriately to supervision, co-workers, and the usual work situations and deal with changes in a routine work setting.

Accordingly, relying upon the Grids, the ALJ found that, "jobs the claimant can perform do not exist in significant numbers in the national economy".  Thus, the ALJ concluded that claimant has been under a disability since January 1, 2002. (T. 38).  Plaintiff does not challenge this portion of the ALJ's determination.

416.921(b).  An ALJ must use a "special technique" to determine the severity of a claimant's mental impairment. *Rosado v. Barnhart*, 290 F.Supp.2d 431, 437 (S.D.N.Y. 2003) (citations omitted); 20 C.F.R. §§ 404.1520a(a); 416.920a(a).  First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable impairment."  20 C.F.R. §§ 404.1520a(b)(1); 416.920a(b)(1).  If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment[ ]." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).

The ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3).  The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4); 416.920a(c)(4).  A ranking of no or "mild" limitation in all of these areas would generally warrant a finding that the claimant's mental impairments are not severe.  *Rosado,* 290 F.Supp.2d at 437.  To satisfy Paragraph B criteria, plaintiff must demonstrate at least two of the following criteria: marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04; *Paratore v. Comm'r of Soc. Sec. Admin.*, 2008 WL 541156, at *5 (N.D.N.Y. 2008); *Rodriguez v. Barnhart,* 2005 WL 643190, at *11 (S.D.N.Y. 2005).

A diagnosis of depression, without more, does not severely impair a plaintiff's

performance of any major life activity. *See Torres v. Astrue*, 550 F.Supp.2d 404, 411 (W.D.N.Y. 2008). The medical evidence must show that depression precludes a plaintiff from performing basic mental work activities. *See Snyder v. Astrue*, 2009 WL 2157139, at *4 (W.D.N.Y. 2009). Moreover, evidence that medication provides relief from the severity of a mental condition can provide substantial evidence to support a finding that a plaintiff is not disabled. *Pennay v. Astrue*, 2008 WL 4069114, at *5 (N.D.N.Y. 2008).

In the April 2000 decision, the ALJ did not engage in a "Paragraph B" analysis and concluded:

> Although the claimant mentioned depression, she has not been hospitalized nor has she had any therapy for a mental condition. (T. 279).

Upon review, the Appeals Council found:

> The medical evidence shows that the claimant may have a mental impairment, but the hearing decision does not contain an evaluation of this impairment pursuant to 20 CFR §§ 404.1520a and 416.920a. Treating physician Graves noted on August 5, 1999 that the claimant reported depressive symptoms. She prescribed treatment with Zoloft. On November 30, 1999, Dr. Graves indicated the claimant's depression was only minimally responsive to Zoloft. Dr. Ganesh examined the claimant on February 4, 1999 and reported some testing was halted because the claimant was "sobbing violently". The decision states the claimant has had no therapy for depression, but does not mention she was treated unsuccessfully with Zoloft. The decision found no severe mental impairment. However, the record does not contain a psychological evaluation and there is no indication of any attempt to obtain a consultative psychological examination. (T. 322).

Accordingly, the Appeals Council directed the ALJ to:

> Evaluate the claimant's mental impairment in accordance with the special technique described in CFR §§ 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional

7

areas described in 20 §§ CFR 404.1520a(c)[3] and 416.920a(c). (T. 323-324).

In the January 2005 decision, the ALJ evaluated plaintiff's mental disorders pursuant to 20 CFR §§ 404.1520a and 416.920a.  The ALJ stated:

> . . . the claimant's mental disorders have been evaluated pursuant to 20 CFR 404.1520a and 416.920a . . . The evidence shows that the claimant's activities of daily living have been quite limited but the overall record shows that such limitations are due to physical complaints, not depression.  Therefore, it is concluded her depression does not result in marked limitation of activities of daily living. Claimant's social functioning also appears to be limited.  However, because she is able to go out for appointments, attend counseling sessions, have visitors and relate to her children and a fiancé, it is concluded she does not have marked restriction in social functioning. Claimant's ability to maintain concentration, persistence and pace has

---

[3] 20 C.F.R. §§ 404.1520a(c) and 416.920a(c) provide, in pertinent part:

c) Rating the degree of functional limitation.

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

20 C.F.R. §§ 404.1520a; 416.920a(c).

reportedly been poor since January 2002.  Yet, prior to that, she was able to concentrate well enough to watch television, listen to the radio, read and manage her own money.  Hence, the evidence fails to show that her depression has caused marked deficiencies in concentration, persistence or pace at all times since her alleged onset date.  Finally, there is no evidence to establish that the claimant has had episodes of deterioration or decompensation, each of extended duration. (T. 28).

Moreover, prior to determining plaintiff's RFC, the ALJ again addressed the Appeals Council order and stated:

[Plaintiff] did not even allege any problems with, or limitations related to, depression when she filed her applications for benefits in 1999 and 2001.  Her primary treating physician, Dr. Graves, while diagnosing depression, focused on claimant's back impairment, never made any mental status findings and did not prescribe medication until August 1999.  There is also no other evidence to indicate a mental impairment, causing limitation of function, prior to January 2002, when claimant began treatment with mental health professionals. (T. 33).

The ALJ further determined that no consultative examination was required given the, "little proof of a mental impairment" and also concluded that plaintiff's "violent sobbing" was plaintiff's "modus operandi when examined by other non-treating WC insurance carrier consultants".  (T. 33).

Upon review, the Court finds that the ALJ complied with the Appeals Council's remand order.  The Appeals Council did not direct the ALJ to order a consultative examination or obtain a retrospective opinion.  Rather, the Appeals Council only instructed the ALJ to consider plaintiff's mental impairment in the context of §§ 404.1520a and 416.920a and to document the application with findings and rationale.  The ALJ followed this directive and employed the "special technique".  Indeed, plaintiff does not object to the ALJ's application of the "special technique" or to the specific degrees of functional limitation assigned by the ALJ.  Instead, plaintiff simply

argues, in general terms, that her depression is severe. Plaintiff's vague argument is unpersuasive. Even if the ALJ determined that plaintiff's depression was severe, plaintiff must still satisfy the second prong of the analysis and establish that she suffered from marked limitations to daily activities, social functioning or maintaining concentration or instances of decompensation. *See Munn v. Comm'r of Soc. Sec.*, 2008 WL 2242654, at *10 (N.D.N.Y. 2008); *see also Armstrong v. Comm'r of Soc. Sec.*, 2008 WL 2224943, at *12 (N.D.N.Y. 2008) (holding that even if the ALJ had determined that the plaintiff's depression was a medically determinable impairment, substantial evidence must exist to support a conclusion that the condition was severe and precluded the plaintiff from doing basic work activities).

Moreover, a review of the administrative record reveals substantial evidence to support the ALJ's assessment. In November 1998, plaintiff began treating with J. Michael O'Connell, M.D., after sustaining an injury as a result of a fall at work.[4] (T. 141). Dr. O'Connell treated plaintiff three times for complaints of low back pain. Dr. O'Connell's records contain no reference, diagnosis or treatment for depression or any other mental impairment. (T. 141-146). In December 1998, plaintiff began treating with Suzanne Begell, D.C., a chiropractor, for low back pain. Dr. Begell treated plaintiff two or three times a week until February 1999. (T. 154). Dr. Begell's records are similarly devoid of any reference to depression or any other mental impairment. (T. 154 - 165). In December 1998, plaintiff began treating with Niles Greenhouse, M.D., for lumbar spasms and pain, thoracic outlet syndrome and sciatica in both legs.[5] (T. 184). Dr. Greenhouse treated plaintiff until June 1999 and his records contain no mention of depression

---

[4] Dr. O'Connell was affiliated with PHP Health Center East. However, the record does not indicate whether he was specialized in any area of medicine.

[5] The record does not indicate whether Dr. Greenhouse was specialized in any area of medicine.

or any other mental impairment. (T. 184-202).

 In August 1999, plaintiff began treating with Kristen Graves, M.D., a specialist in "adult medicine" at Syracuse Community Health Center, Inc.[6]  (T. 204).  During the initial visit, Dr. Graves diagnosed plaintiff with "depression secondary to chronic disability" and prescribed Zoloft.[7] (T. 204).  For the next two months, Dr. Graves noted that Zoloft provided "some" or "minimal" relief. (T. 227, 230, 235).  On November 30, 1999, Dr. Graves noted that plaintiff was "tearful" and "sad" and referred plaintiff to Laurie Sanderson, a certified social worker/counselor affiliated with Syracuse Community Health Center for psychosocial support. (T. 237, 510).  In January 2000, Dr. Graves noted that plaintiff had not seen Ms. Sanderson as she was, "waiting until after the holidays". (T. 240).  In February 2000, Dr. Graves noted that plaintiff's mood was better even though she still had not seen Ms. Sanderson. (T. 439).  Dr. Graves examined plaintiff in March and April 2000 but her records contain no mention of depression or mental impairments. (T. 439, 441).  In May 2000, Dr. Graves referred plaintiff and her son to a pastor for counseling as plaintiff indicated that talking in church was helpful. (T. 443, 445).  In June 2000, Dr. Graves noted plaintiff was tearful, "restarted" plaintiff on Zoloft and again encouraged plaintiff to make an appointment with Ms. Sanderson. (T. 447).  In July 2000, plaintiff's mental status was "better". (T. 449).  Dr. Graves examined plaintiff four times from August 2000 through February 2001.  These records are devoid of any reference to depression or mental limitations. (T. 449-507).  On February 28, 2001, Dr. Graves noted that plaintiff's depression was "worse after

---

[6] According to the August 27, 1999 office notes, plaintiff was seen "one month ago", however, the record does not contain any office notes from that visit.

[7] Zoloft is used to treat depressive, obsessive-compulsive, and panic disorders. *Dorland's Illustrated Medical Dictionary,* 1724, 2120 (31st ed. 2007).

discontinuing Zoloft". (T. 507).  Dr. Graves prescribed Effexor and indicated that she would refer plaintiff to a therapist closer to her home as plaintiff, "never did commence with Laurie Sanderson through our health center".[8] (T. 507).  In July 2001, during plaintiff's last visit with Dr. Graves, plaintiff's mood was "ok" and plaintiff stated that she "took a break from seeing doctors". (T. 508).  Dr. Graves noted that plaintiff was not taking Effexor or Zoloft. (T. 508).  On September 25, 2002, plaintiff had an initial consultation with Laurie Sanderson. (T. 510).

        While the record establishes that plaintiff arguably suffered from some depression, there is no evidence that the condition limited her ability to function in any significant way.  The record lacks any opinion by any treating physician or mental health professional regarding plaintiff's alleged mental impairments.  Indeed, there is no evidence that plaintiff's depression affected her ability to function appropriately or independently. As noted, plaintiff had limited treatment for her claims of depression by her treating physician who was not specialized in the area of mental health.  Moreover, Dr. Graves' records reflect routine treatment and establish that Zoloft provided plaintiff with some relief.  Dr. Graves also continually noted plaintiff's failure to seek treatment with Ms. Sanderson.  While it is true that the failure to seek treatment due to finances can negate the inference that the effect of a plaintiff's medical condition is not as great as alleged, *see Latham v. Comm'r of Soc. Sec.*, 2009 WL 1605414, at *12, n. 15 (N.D.N.Y.2009), there is no evidence in the record to establish that plaintiff failed to seek mental health treatment for her condition due to financial constraints.  Indeed, Ms. Sanderson was affiliated with Dr. Graves' office and plaintiff eventually sought treatment with Ms. Sanderson.

        Plaintiff offers no legal basis for her argument that a consultative examination was

_____

        [8] Effexor is used as an antidepressant and antianxiety agent. *Dorland's* at 602, 2074.

required or necessary. *See Yancey v. Apfel*, 145 F.3d 106, 114 (2d Cir.1998). Under the Social Security regulations, an ALJ has discretion to order a consultative examination where he deems it is warranted. *Hughes v. Apfel*, 992 F.Supp. 243, 248 (W.D.N.Y.1997) (citing 20 C.F.R. § 404.1517)). An ALJ is not obligated to send a litigant for a consultative examination if the facts do not warrant or suggest the need for such an examination. *See Cruz v. Shalala*, 1995 WL 441967, at *5 (S.D.N.Y.1995) (holding that the right to a post-hearing consultative examination exists only where a claimant's medical sources cannot or will not provide sufficient medical evidence regarding impairment for a determination about whether the claimant is disabled). Where a plaintiff suggests a possible mental impairment, but no treatment has been recommended or received, the ALJ must assess whether there is any evidence of work-related functional limitations resulting from the possible mental impairment. *See Haskins v. Comm'r of Soc. Sec.*, 2008 WL 5113781, at *7, n. 5 (N.D.N.Y.2008) ("If the evidence does not support work-related functional limitations resulting from the possible mental impairment, additional mental development is not necessary and completion of a Psychiatric Review Technique Form is not required and review by a psychiatrist or psychologist is not necessary).

Here, the ALJ was not obligated to send plaintiff, who was represented by counsel, for a consultative examination as the facts did not warrant such an examination. Plaintiff did not present objective proof of mental impairments and failed to seek treatment with any mental health specialist during the relevant time period. *See Beal v. Chater*, 1995 WL 819041, at *4 (W.D.N.Y.1995) (holding that the plaintiff failed to present sufficient evidence that a consultative examination was warranted, i.e., the plaintiff failed to keep appointments with specialists and treating physicians did not order diagnostic testing). The record does not suggest that plaintiff

suffered from a mental impairment that resulted in work related limitations. As such, the ALJ had

no reason to believe that plaintiff had a mental impairment that required further development.

Accordingly, it was not necessary for the ALJ to develop the record further and order a

consultative examination.

Plaintiff also argues that the ALJ had a duty to request a retrospective opinion from

plaintiff's mental health providers, Dr. Hines and/or Laurie Sanderson. The regulations state that,

"[w]hen the evidence we receive from your treating physician . . . or other medical source is

inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating

physician . . . or other medical source to determine whether the additional information we need is

readily available." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(e)

(holding that ALJ did not neglect this duty as there was nothing presented at the hearing to

indicate that retrospective assessments would have revealed any useful information or that the

physicians were prepared to undertake such assessments)).

Here, plaintiff had no medical treatment by any mental health professional during the

relevant time period. Dr. Graves' records reveal periodic complaints and sporadic treatment for

depression. Dr. Hines was not plaintiff's treating physician during the eligibility period and

therefore, any retrospective opinion he would render would be based solely upon Dr. Graves'

records. *Cf. Brown v. Apfel*, 1998 WL 767140, at *4 (E.D.N.Y. 1998) (holding that ALJ should

have requested a retrospective opinion from treating physician who treated the plaintiff during

relevant time because record suggested that the plaintiff's condition and symptoms were

constant). Ms. Sanderson was a counselor, a non-treating source, and therefore, her opinions are

not entitled to controlling weight. Plaintiff has not alleged that there are gaps in plaintiff's

medical history and has not provided evidence that Dr. Hines would have provided a retrospective assessment, if requested. *Eltayyeb v. Barnhart*, 2003 WL 22888801, at *7 (S.D.N.Y. 2003). The evidence received from the treating physicians was adequate and allowed the ALJ to make a determination as to disability. Based upon the lack of objective medical evidence of any mental impairment, any retrospective opinion that Dr. Hines provided would not be entitled to controlling weight. *See Falco v. Astrue*, 2008 WL 4164108, at *7 (E.D.N.Y. 2008).

The Court finds that the ALJ complied with the Appeals Council directives, properly considered the entire record and found that plaintiff's depression did not impose any significant functional limitations. The ALJ's determination is supported by substantial evidence and thus, remand is not warranted.

**B.      Treating Physician Rule**

Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record"); 20 C.F.R. § 404.1527(d)(2). The less consistent an opinion is with the record as a whole, the less weight it is to be given. *Stevens v. Barnhart*, 473 F.Supp.2d 357, 362 (N.D.N.Y. 2007); *see also Otts v. Comm'r of Soc. Sec.*, 249 F.App'x 887, 889 (2d Cir. 2007) (an ALJ may reject such an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record"). An ALJ may refuse to consider the treating physician's opinion

controlling if he is able to set forth good reason for doing so. *Barnett v. Apfel*, 13 F.Supp.2d 312, 316 (N.D.N.Y. 1998). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Peralta v. Barnhart*, 2005 WL 1527669, at *10 (E.D.N.Y. 2005) (remanding case where the ALJ failed to explain the weight, if any, assigned to the treating physician's opinions) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999)). When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (I) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2).

While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence. *See Martin v. Astrue*, 337 F.App'x 87, 89 (2d Cir. 2009). The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *Williams v. Comm'r of Soc. Sec.*, 236 F.App'x 641, 643-44 (2d Cir. 2007).

Plaintiff argues that the ALJ failed to apply the appropriate legal standard of the treating physician rule with respect to Dr. Greenhouse, Dr. Begell, Dr. Graves and plaintiff's providers from the Pain Treatment Center. Plaintiff also contends that the ALJ erred when he afforded "considerable weight" to the opinions of non-treating physicians including the state agency

examining physician.

### 1.    Medical Treatment

On November 10, 1998, plaintiff sought treatment with Dr. O'Connell complaining of low back pain after a fall at work. (T. 142). Dr. O'Connell noted that plaintiff suffered from chronic back problems since 1993. After an examination, Dr. O'Connell referred plaintiff to physical therapy and gave her a prescription for Motrin and a note for light duty at work. (T. 144). On November 16, 1998, plaintiff returned for a follow up and was given a prescription for Flexeril and a note to stay out of work for one week.[9] (T. 146).

On December 14, 1998, plaintiff was examined by Dr. Niles Greenhouse. (T. 184). On January 27, 1999, Dr. Greenhouse provided an opinion with regard to plaintiff's functional limitations for the New York State Office of Temporary and Disability Assistance.[10] (T. 184). Dr. Greenhouse treated plaintiff for dorsal-lumbar spinal spasms/pain, bilateral thoracic outlet syndrome and sciatica in both legs. (T. 184). Dr. Greenhouse indicated that straight leg raising was twenty degrees on the right and one degree on the left. (T. 185). Dr. Greenhouse noted that plaintiff limped, walked with a cane and wore a back brace. (T. 186). Dr. Greenhouse prescribed Motrin, Vicodin and Flexeril, which all provided some relief with no side effects.[11] (T. 187). Dr. Greenhouse concluded that plaintiff could lift and carry 1 ½ pounds; could stand and/or walk and

---

[9] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's* at 465, 725.

[10] The opinion indicates that plaintiff was first seen on December 14, 1998. However, the record does not contain any office notes from that examination. According to the opinion, plaintiff's most recent examination was January 27, 1999.

[11] Vicodin is a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. *Dorland's* at 890, 2084.

sit for less than 20 minutes and could not push or pull "at all". (T. 189).  Dr. Greenhouse stated

that the physical findings were consistent with plaintiff's level of pain but noted that MRI scans,

EMGs and surgical consults were "pending approval". (T. 188).  In April 1999, plaintiff

telephoned Dr. Greenhouse's office and stated that she needed, "physical findings to substantiate

[her] need for cane". (T. 201).  Dr. Greenhouse noted that plaintiff will need a cane "for some

time" because she was not a candidate for surgery unless she lost weight. (T. 201).  On June 1999,

Dr. Greenhouse's notes indicate:

> Dr still states he is not sure if cane will be needed by 11/99 and unsure
> of RFC.  PMN is an issue w/clt and it is hard to say.  Unable to give
> specific degrees of ROM or severity of spasm, tenderness. (T. 201).

On February 4, 1999, Dr. Kalyani Ganesh, an orthopedist, examined plaintiff at the

request of the agency.  (T. 150).  Dr. Ganesh noted that plaintiff utilized a cane but based upon

her observations of plaintiff's movements during the examination, the doctor opined that the

device was not necessary. (T. 151).  Dr. Ganesh noted no tenderness or spasm and negative

straight leg raising.  Dr. Ganesh diagnosed plaintiff with chronic low back pain with numbness.

(T. 152).  Dr. Ganesh opined that plaintiff had no gross limitations to sitting, standing walking or

climbing but was unable to comment further as plaintiff was "sobbing violently" and "was not

putting in a very good effort".

On February 18, 1999, Dr. Begell, plaintiff's chiropractor, opined that plaintiff could not

lift or carry, could stand and/or walk less than 2 hours per day, could sit less than 6 hours per day.

(T. 159).  Dr. Begell indicated that she began treating plaintiff on December 3, 1998 and treated

her two to three times per week. (T. 154).  However, the record does not contain any office notes

or records of these visits.

On March 3, 1999, an MRI of plaintiff's lumbar spine revealed degenerative discs at L4-5 and L5-S1. (T. 165).

On March 15, 1999, John J. Cambareri, M.D., an orthopedist, evaluated plaintiff at the request of Dr. Begell. (T. 214). Dr. Cambareri noted plaintiff was "in no acute distress" and exhibited no tenderness over her neck. Dr. Cambareri found tenderness in the lumbar area that was "severe" with some spasm but plaintiff exhibited a negative stretch test with good motion of the hips and knees. Dr. Cambareri noted that motor, sensory, vascular and deep tendon reflex examinations of the lower extremities was normal. (T. 214). Dr. Cambareri opined that plaintiff was not a candidate for physical therapy or surgical intervention. He also stated, "hopefully over the next one to two months she will be able to return to her former occupation but if not I think that she certainly should be able to return to some lighter occupation over that period of time". (T. 215).

On August 3, 1999, Dr. David Hootnick performed an orthopedic evaluation of plaintiff at Dr. Greenhouse's request. (T. 394). Dr. Hootnick noted that plaintiff was unable to cooperate with the examination as she was in "such distress". (T. 394). Dr. Hootnick noted "full passive range of motion of all the joints in her upper and lower extremities". (T. 395). Dr. Hootnick concluded that plaintiff, "demonstrates completely factitious symptoms and from my point of view with a negative MR scan she is discharged to full activities without restriction" and noted that she has "no organic pathology what so ever". (T. 395).

On August 27, 1999, plaintiff began treating with Kristin Graves, M.D. (T. 227). At that time, plaintiff was taking Flexeril and Zoloft.[12] Plaintiff complained of tingling and numbness in

---

[12] During the initial visit in July 1999, Dr. Graves prescribed Zoloft.

her extremities with "terrible pain" in her back and neck. (T. 227).  Dr. Graves noted tenderness in the lumbar region, decreased sensation in her left arm and leg and fibromyalgia trigger points.[13] (T. 228).   Dr. Graves treated plaintiff once a month until February 2001.  During that time, Dr. Graves diagnosed plaintiff with chronic back pain and paresthesias.[14]  Dr. Graves prescribed various medications including Zoloft, Tylenol, Flexeril, Skelaxin, Neurontin and Effexor.[15]  Dr. Graves referred plaintiff to the pain clinic and requested various diagnostic tests including MRIs and EMGs.  (T. 238).

On November 9, 1999, EMG and nerve conduction studies were normal.  (T. 422).  On December 9, 1999, plaintiff was treated at the Pain Treatment Center for lumbar radiculopathy. (T. 403).  Plaintiff initially received Neurontin and Tylenol and in February 2000, plaintiff had lumbar epidural steroid blocks. (T. 408).  Plaintiff continued to receive treatment at the Pain Treatment Center until July 2001.  Three months later, on October 30, 2001, plaintiff returned to the pain clinic after she tripped and fell. (T. 588).  Dr. Shylaja Maini examined plaintiff and noted that she complained of constant pain in her back. (T. 589).  Dr. Maini noted that plaintiff was previously advised to see an orthopedic surgeon for her lower back. (T. 589).  Dr. Maini prescribed Flexeril, Vioxx and Tylenol and suggested hydrotherapy. (T. 589).

On April 7, 2000, an MRI of plaintiff's brain was normal and an MRI of the cervical spine

---

[13] Fibromyalgia is pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points. *Dorland's* at 711.

[14] Paresthesias refers to "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's* at 1234.

[15] Skelaxin is a centrally acting skeletal muscle relaxant used in the treatment of painful musculoskeletal conditions.  *Dorland's* at 1163, 1748.  Neurontin is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures.  *Id.* at 764, 1287

was unremarkable. (T. 434).  On April 25, 2000, an MRI of plaintiff's thoracic spine revealed mild scoliosis but otherwise, "unremarkable" and a repeat MRI of plaintiff's lumbar spine revealed disc disease at L2-3, L4-5, L5-S1 but no evidence of a disc herniation. (T. 435-436). On May 10, 2000, Dr. Graves reviewed plaintiff's MRI studies of her neck, thoracic spine and brain found that they did not indicate any cause for her paresthesias. (T. 443).

On June 30, 2000, at Dr. Graves' request, plaintiff went to University Hospital for a physical therapy evaluation. (T. 427).  The therapist noted that plaintiff, "was only here for a TENS unit for pain.  She is unwilling to participate in any exercise program at this time due to her severe pain levels". (T. 427).  On September 19, 2000, plaintiff returned to University Hospital for an evaluation. (T. 428).  The evaluator noted that plaintiff was a half hour late and therefore, her evaluation was based upon her subjective history.  (T. 428).  Plaintiff was discharged after she attended two therapy sessions and then failed to contact the office. (T. 432).

On March 26, 2001, Dr. Ganesh re-examined plaintiff but was unable to render a medical source statement as plaintiff was not cooperative. (T. 495).

On October 1, 2004, a third MRI of plaintiff's lumbar spine revealed moderate disc bulge at L5-S1 and mild disc bulge at L2-3 and L4-5. (T. 618).

## 2.    Drs. Greenhouse and Hootnick

Plaintiff claims that the ALJ should have afforded controlling weight to Dr. Greenhouse's opinion as it was supported by substantial evidence and acceptable clinical and diagnostic techniques.  Plaintiff also argues that the ALJ erroneously afforded "considerable weight" to the Dr. Hootnick's opinion.  The Commissioner claims that Dr. Greenhouse's opinion was inconsistent with the minimal objective findings and involved a determination rendered in the

context of plaintiff's workers' compensation claim on an issue reserved for the Commissioner.

In the decision, the ALJ stated:

> Dr. Begell and Dr. Greenhouse were claimant's treating sources at one point. However, because their opinions regarding claimant's functional capabilities and limitations are not supported by clinical findings, are not consistent with the minimal objective findings and the conclusions of other examining and treating sources and are not even consistent with claimant's own statements, these opinions are given little weight. (T. 32).

In the decision, the ALJ summarized, considered and evaluated relevant medical evidence. Dr. Greenhouse's opinion regarding plaintiff's work ability and functional limitations is extremely restrictive. Although Dr. Greenhouse was a treating physician, the objective medical evidence and evidence from other physicians does not support such extensive limitations. *Dumas v. Comm'r of Soc. Sec*., 2008 WL 4104685, at *4 (E.D.N.Y. 2008) (holding that the ALJ did not err in refusing to give great weight to the opinions of the plaintiff's treating physicians because their opinions indicated that the plaintiff's abilities were much more limited and restricted than the opinions of other medical consultants and inconsistent with bulk of the plaintiff's medical records).   While the record contains some of Dr. Greenhouse's treatment notes, there are no office records documenting plaintiff's treatment from December 14, 1998 through January 27, 1999, the date of Dr. Greenhouse's assessment.  Accordingly, the Court is unable to determined what objective evidence, if any, Dr. Greenhouse relied upon in formulating his opinion. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (when a treating physician's opinions are inconsistent with even his own treatment notes, an ALJ may properly discount those opinions). Dr. Greenhouse's opinion is also clearly inconsistent with diagnostic and clinical testing. Plaintiff's own treating physician, Dr. Graves, noted that plaintiff's EMG and nerve conduction

studies were "normal" and further opined that MRI studies did not provide a "cause" for her parasthesias.  Dr. Hootnick also noted that plaintiff's MR Scan was "negative".

Finally, Dr. Greenhouse's opinions are in contradiction with the opinions of other medical experts, including Dr. Hootnick, the orthopedic specialist to whom Dr. Greenhouse referred plaintiff. Plaintiff objects to the ALJ's decision to afford "considerable weight" to Dr. Hootnick's opinions.  It is well established in this Circuit that the report of a consultative physician, may constitute substantial evidence contradicting the opinion of a treating physician.  *Knight v. Heckler*, 1985 WL 2889, at *4 (S.D.N.Y. 1985).

With regard to Dr. Hootnick, the ALJ stated:

> Dr. Hootnick's opinions are given considerable weight because he is a specialist who saw the claimant at the request of her treating physician and his opinions are consistent with his examination findings and are not inconsistent with the examination findings of other medical sources.  (T. 32).

Dr. Hootnick's opinion completely contradicts Dr. Greenhouse's conclusions.  Notably, Dr. Hootnick opined that plaintiff demonstrated completely factitious symptoms and could participate in full activities without restrictions. (T. 395).  Dr. Hootnick's opinion is supported by Dr. Cambareri, another orthopedic specialist who examined plaintiff at the request of Dr. Begell. Dr. Cambareri opined that plaintiff "certainly should be able to return to some lighter occupation".  (T. 215).  Moreover, the diagnostic testing and clinical findings support Dr. Hootnick's assessments.  Based upon the objective medical evidence, it was proper for the ALJ resolve the conflicting opinions by deciding to accord greater weight to the opinions of Dr. Hootnick, a medical specialist.  *Corson v. Astrue*, 601 F.Supp.2d 515, 531 (W.D.N.Y. 2009) (citing 20 C.F.R. § 404.1527(d)(5)).

23

The ALJ further noted that Dr. Greenhouse's opinions were rendered in the context of plaintiff's workers' compensation claim. Workers' compensation determinations are directed to the workers' prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act.". *Gray v. Chater*, 903 F.Supp. 293, 301, n. 8 (N.D.N.Y.1995).  Because disability for purposes of workers' compensation benefits is determined under a different standard than the standard used in the Social Security context, the ALJ is not bound to afford Dr. Greenhouses's finding controlling weight. *See Pollard v. Astrue*, 2009 WL 2156913, at *7 (N.D.N.Y. 2009) (citing *Dibernardo v. Chater*, 979 F.Supp. 238, 243 (S.D.N.Y. 1997)).

The ALJ applied the appropriate legal standards and provided "good reasons" for declining to assign Dr. Greenhouse's opinion controlling weight. The ALJ did not completely disregard Dr. Greenhouse's opinion, rather, the ALJ properly considered the lack of evidence supporting Dr. Greenhouse's opinion and documented his rationale.

### 3.    Dr. Begell

Plaintiff concedes that Dr. Begell, a chiropractor, is not an "acceptable medical source", however, plaintiff argues that the ALJ had a duty to evaluate her opinion pursuant to SSR 06-3p.[16] According to the regulations, a chiropractor's opinion is not a medical opinion. *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995). Therefore, the treating physician rule does not apply to chiropractors. *Diaz,* 59 F.3d at 313; *see also Kim v. Barnhart*,  2005 WL 1107048, at *8 (S.D.N.Y. 2005).  The regulations provide that medical opinions are statements from physicians

---

[16] SSR 06-3p provides that chiropractors are considered "other sources" and their opinions "may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight".  *See Dziewa v. Astrue*, 2010 WL 811891, at *4 (W.D.N.Y. 2010).

and psychologists or "other acceptable medical" sources.  *See* 20 C.F.R. § 404.1527(a)(2).

Chiropractors are expressly listed as "other sources" whose "[i]nformation . . . may also help us to

understand how your impairment affects your ability to work."  *See* 20 C.F.R. § 404.1513(e); *see*

*also Diaz*, 59 F.3d at 313.  It is within the ALJ's discretion to determine what weight, if any, to

accord to the opinions of a chiropractor.  *See Rodriguez v. Barnhart*,  2004 WL 2997876, at *8

(S.D.N.Y. 2004); *see also Diaz*, 59 F.3d at 314 (holding that under no circumstances can the

regulations be read to require the ALJ to give controlling weight to a chiropractor's opinion.).  It

was well within the ALJ's discretion to credit the opinions of the consulting physicians over those

of the treating chiropractors.  *O'Connor v. Chater*, 1998 WL 695418, at *1 (2d Cir. 1998).

Upon a review of the record, the ALJ properly assigned "limited weight" to Dr. Begell's

opinions.  On February 18, 1999, Dr. Begell opined that plaintiff could not lift or carry anything,

could stand and/or walk less than 2 hours per day, could sit less than 6 hours per day. (T. 159).

However, the record does not contain any office notes or treatment records from Dr. Begell.

Thus, similar to Dr. Greenhouse, Dr. Begell's extremely restrictive assessment is not supported

by her own office notes or records.  Moreover, Dr. Begell's assessment is unsupported by

objective medical testing and is contrary to the weight of the medical evidence including Dr.

Hootnick's and Dr. Cambareri's assessments.  Accordingly, the Court finds that the ALJ did not

err in failing to afford Dr. Begell's conclusions anything other than "little weight".

### 4.      Duty to develop record

Plaintiff claims that the ALJ erred when he failed to obtain an opinion from the physicians

at the Pain Treatment Center or from Dr. Graves.  (Dkt. No. 13, p. 22-25).  Moreover, plaintiff

claims that the ALJ should have "recontacted" Dr. Greenhouse before assigning limited weight to

his opinions.  The Commissioner contends that the medical record was complete and thus, the

ALJ was under no obligation to seek additional opinions or information.  Moreover, defendant

claims that both plaintiff and her counsel could have requested a medical source statement from treating sources.

The ALJ has a "particularly important" duty to develop the record when obtaining information from a claimant's treating physician due to the "treating physician" provisions in the regulations. *Devora v. Barnhart*, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002). This obligation includes obtaining the treating physicians' assessments of plaintiff's functional capacity. 20 C.F.R. § 404.1512(e); *see also Hardhardt v. Astrue*, 2008 WL 2244995, at *9 (E.D.N.Y. 2008). Recontacting medical providers is necessary when the ALJ cannot make a disability determination based on the evidence of record. *Donmore v. Astrue*, 2009 WL 2982982, at *4 (W.D.N.Y. 2009) (citing 20 C.F.R. § 404.1512(e)). However, the ALJ does not have a duty to re-contact a treating physician if the evidence the treating source submits as a whole, is complete. *Hluska v. Astrue*, 2009 WL 799967, at *17 (N.D.N.Y. 2009). Moreover, the ALJ is not obligated to recontact treating physicians when the record contains no critical gaps and multiple medical opinions from several different sources concerning plaintiff's impairments. *Taylor v. Astrue*, 2008 WL 3884356, at *13 (N.D.N.Y. 2008). The ALJ does not need to attempt to obtain every extant record of the claimant's doctor visits when the information on the record is otherwise sufficient to make a determination, and need not request more detailed information from the treating physician if the physician's report is a sufficient basis on which to conclude that the claimant is not disabled. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In the decision, the ALJ concluded that Dr. Graves offered an opinion on an issue that is reserved for the Commissioner and offered the opinion in the context of plaintiff's workers' compensation claim. Thus, the ALJ refused to afford her opinion "controlling weight". (T. 32).

Here, plaintiff's argument regarding the ALJ's duty to develop the record is contained in one sentence, "it does not appear that the ALJ attempted to obtain an opinion of limitations from

the physicians at the Pain Treatment Center or from Dr. Graves".  (Dkt. No. 13, p. 25).  Plaintiff offers nothing more than vague, conclusory assertions regarding the ALJ's obligation.  Plaintiff does not contend that the record is incomplete or that there are critical gaps or multiple conflicting medical opinions.  Plaintiff does not identify the treating physician or physicians at the Pain Management Center from whom the ALJ should have obtained an opinion.   Moreover, plaintiff was represented by a competent attorney who did not allege that there were gaps in the record during the administrative hearing.  The record contains two opinions regarding plaintiff's functional limitations - one from plaintiff's treating physician and the other from plaintiff's chiropractor.  In addition, the record contains two Physical Residual Functional Capacity Assessments from non-examining disability analysts.  With regard to Dr. Greenhouse, his records indicate that he was unable to formulate an RFC. (T. 201).

After reviewing the administrative transcript, the Court finds that the record adequately and completely reflected plaintiff's medical history.  Substantial evidence supports the ALJ's conclusions without the need for further evidence or clarification from the treating physicians.  Accordingly, the ALJ had no obligation to contact plaintiff's treating physicians to supplement the existing record.

**5.    Dr. Ganesh**

Plaintiff claims that the ALJ erroneously afforded "considerable weight" to Dr. Ganesh's opinions.  The Commissioner contends that the ALJ reasonably accorded "considerable weight" to  Dr. Ganesh's opinions as they were consistent with examination findings.

The ALJ may give significant weight to the opinions of consultative physicians if the conclusions are well supported by clinical evidence; consistent with the overall record and claimant's reported activities and based upon a thorough examination.  *See Palaschak v. Astrue*, 2009 WL 6315324, at *6 (N.D.N.Y. 2009) (citing 20 C.F.R. 404.1527(f)).  In this case, the ALJ

stated:

> Dr. Ganesh is not a treating physician but, because her opinions and conclusions are supported by her clinical findings and are not inconsistent with the findings of other examining and treating sources, they are given considerable weight. (T. 32).

Dr. Ganesh examined plaintiff twice, at the request of the agency.  After the first examination, Dr. Ganesh  was unable to comment on plaintiff's limitations due to plaintiff's "violent sobbing".  After the second examination, Dr. Ganesh was unable to render an opinion due to plaintiff's lack of cooperation.  Accordingly, the ALJ erroneously assigned "controlling weight" to Dr. Ganesh's opinions.  By the doctor's own admission, she was unable to conduct a complete and thorough examination of plaintiff.  While the Court finds that the ALJ's decision to afford "controlling weight" to Dr. Ganesh's opinion was erroneous, the correct analysis of Dr. Ganesh's opinions would not change the outcome and thus, does not provide a basis for a remand to the Commissioner.  *See Jones v. Barnhart*, 2003 WL 941722, at *10 (S.D.N.Y. 2003) (citing *Walzer v. Chater*, 1995 WL 791963 at *9 (S.D.N.Y. 1995) (ALJ's failure to discuss a treating physician's report was harmless error where consideration of report would not have changed outcome)).

### C.    Residual Functional Capacity Analysis

Plaintiff argues that the ALJ's failure to follow the Appeals Council directives resulted in an RFC determination that is not supported by substantial evidence. Rather, plaintiff contends that substantial evidence supports the determination that plaintiff had the RFC for significantly less than a full range of sedentary work. (Dkt. No. 13, p. 25-26).

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and

> continuing basis, and the RFC assessment must include
> a discussion of the individual's abilities on that basis. A
> 'regular and continuing basis' means 8 hours a day, for
> 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling

Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996

WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination,

the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including

pain and other limitations which could interfere with work activities on a regular and continuing

basis.  20 C.F.R. § 404.1545(a).

In this case, the ALJ found plaintiff had the RFC:

> lift, carry, push and pull 20 pounds occasionally and 10 pounds
> frequently, stand and walk six hours and sit six hours in an eight-hour
> work day and occasionally climb, balance, stoop, knee, crouch and
> crawl.  Furthermore, she had the ability to understand, carry out and
> remember simple instructions, use judgment, respond appropriately to
> supervision, co-workers, and the usual work situations and deal with
> changes in a routine work setting. (T. 34).

For the reasons set forth above, the Court finds that the ALJ's RFC determination is

supported by substantial evidence.  The ALJ complied with the Appeals Council directives and

performed a proper legal analysis of the medical evidence and opinions.  Even though the ALJ

improperly afforded controlling weight to Dr. Ganesh's opinions, the record contains substantial

evidence supporting the ALJ's RFC determination and plaintiff's argument that she had the RFC

for significantly less than a full range of sedentary work is without merit.

**D.      Vocational Expert and Use of the Grids**

Plaintiff argues that she is unable to stoop, requires the use of an assistive device and

suffers from mental limitations.  Plaintiff claims that these limitations precluded the ALJ from

relying upon the Grids and required testimony from a vocational expert.  (Dkt. No. 13, p. 26).

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work.  20 C.F.R. §§ 416.920, 416.960.  Ordinarily, the Commissioner meets his burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)."  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  "The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling."  *Zorilla v. Chater*, 915 F.Supp. 662, 667, n.2 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1567(a)).

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids.[17]  *Bapp*, 802 F.2d at 605.  The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations - so that he is unable to perform the full range of employment indicated by the medical vocational guidelines."  *Bapp*, 802 F.2d at 605-06.  The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to

---

[17]  A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(I), (ii), (iv), (v), 416.969a(a), (c)(I), (ii), (iv), (v); *see also Rodriguez v. Apfel*, 1998 WL 150981, *10, n. 12 (S.D.N.Y. 1998).

deprive him of a meaningful employment opportunity". *Bapp*, 802 F.2d at 606.  Under these

circumstances, to satisfy his burden at step five, the Commissioner must "introduce the testimony

of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant

can obtain and perform." *Rosa*, 168 F.3d at 78 (quoting *Bapp,* 802 F.2d at 604).   Therefore, when

considering nonexertional impairments, the ALJ must first consider the question - whether the

range of work the plaintiff could perform was so significantly diminished as to require the

introduction of vocational testimony.  *Samuels v. Barnhart*, 2003 WL 21108321, at *12 (S.D.N.Y.

2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's

mental and physical limitations on his work capacity before using the grids).

In this case, the ALJ determined that plaintiff had the ability to perform the full range of

light work.  The ALJ also considered SSR 85-15 and noted that basic mental demands of

unskilled work include the ability to understand, carry out and remember simple instructions,

respond appropriately to supervision, co-workers, and the usual work situations and deal with

changes in a routine work setting. (T. 35).  The ALJ considered plaintiff's age, education and past

work experience and consulted Rules 202.17[18], 202.18[19] and 202.19[20] and found plaintiff was not

disabled. (T. 38).   Plaintiff argues that the ALJ failed to consider her mental limitations.

However, there is no evidence in the record that plaintiff's mental impairments limited her

capacity for work.  *See Farr v. Astrue*, 2009 WL 1955442, at *10 (N.D.N.Y. 2009) (the ALJ

_____

[18]   Medical-Vocational Rule 202.17 indicates a finding of not disabled for a claimant who is a younger individual (45 to 49 years old) with a limited education or less, and with unskilled or no past work. 20 C.F.R. Pt. 404, Subpt. P, App 2, Rule 202.17.

[19]   Medical-Vocational Guideline Rule 202.18 requires a finding of not disabled when a claimant is a younger individual (45 to 49 years old), has a limited education or less, and has unskilled or no past work. 20 C.F.R. Pt. 404, Subpt. P, App 2, Rule 202.18.

[20]   Medical-Vocation Guideline Rule 202.19 requires a finding of not disabled when the claimant is a younger individual (45 to 49 years old), with a limited education or less, and skilled or semi-skilled skills that are not transferrable.  20 C.F.R. Pt. 404, Subpt. P, App 2, Rule 202.19.

properly relied upon SSR 85-15 and concluded that the records supported the plaintiff's abilities

to meet these requirements).   In his decision, the ALJ outlined and considered, with sufficient

detail, the medical evidence regarding plaintiff's mental impairments. *See Niven v. Barnhart*, 2004

WL 1933614, at *8 (S.D.N.Y.2004) (holding that although the ALJ did not state that the

plaintiff's impairments were insignificant, the ALJ directly addressed the impact of the

nonexertional impairments).

Plaintiff's medical records are devoid of any reference to any non-exertional limitations as

a result of her depression. For the reasons set forth above, the ALJ properly considered plaintiff's

mental impairment and determined that it would not significantly diminish her range of work to

deprive her of meaningful employment. As such, the ALJ did not err in failing to request the

presence of a vocational expert to determine whether plaintiff could perform light work. *Elias v.

Apfel*, 54 F.Supp.2d 172, 178 (E.D.N.Y.1999) (holding that the ALJ specifically noted that the

plaintiff's symptoms were not of sufficient severity, frequency, and duration so as to cause

disability and significantly diminish his ability to perform light work). Accordingly, the Court

finds this objection to be without merit.

Plaintiff correctly notes that the ALJ found that plaintiff could only occasionally stoop.

However, according to the SSA's rulings, although an inability to bend, stoop, crouch, or kneel

more than occasionally would substantially affect an individual's ability to perform most medium,

heavy, and very heavy jobs, such limitations would not substantially affect an individual's ability

to perform light or sedentary work. *McDonaugh v. Astrue*, 672 F.Supp.2d 542, 571 (S.D.N.Y.

2009) (citing SSR 85-15, 1985 WL 56857, at *2-3 (S.S.A.1985)).  Thus, to the extent that

plaintiff's non-exertional impairments consisted of an inability to engage in prolonged or repeated

stooping (whether because of her physical inability to perform these activities or because of pain

experienced during such activities), the ALJ's use of the grids was appropriate.  *See id.*

Finally, the Court is unpersuaded by plaintiff's contention that the use of an assistive device precludes reliance upon the grids.  The use of a cane generally imposes only exertional limitations.  *Martinez v. Astrue*, 2009 WL 2168732, at *18 (S.D.N.Y. 2009) (citing See 20 C.F.R. Pt. 404, subpt. P, app. 1, § 1.00(J)(4) (use of an assistive device may adversely impact a claimant's ability to lift, carry, push or pull, "by virtue of the fact that one or both upper extremities are not available for such activities")).  In this matter, plaintiff simply argues that she suffers from "significant non-exertional impairments".  Plaintiff fails to identify her non-exertional limitations or how the limitations resulted from the use of an assistive device or cane.  *See id.* (citing § 404.1569a(c)).  Therefore, the ALJ did not err when he failed to consider this alleged limitation.

Accordingly, the Court concludes that the ALJ applied the appropriate legal standards and properly relied upon the Grids.

**IV.     CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings is **GRANTED**; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED**; and it is further

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: September 29, 2010
       Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge